Maria N. TEVES

v.

Linda S. McMAHON, Acting Commissioner of the Social Security Administration [1].

Civil Action No. 05–10686–RGS.

United States District Court, D. Massachusetts.

Feb. 1, 2007.

1. Linda S. McMahon was appointed Acting Commissioner of Social Security on January 20, 2007. She is substituted as the defendant for former Commissioner Jo Anne Barnhart. *See* Fed.R.Civ.P. 25(d)(1).

Maria L. Nunez, Green & Greenberg, Providence, RI, for Maria N. Teves.

George B. Henderson, United States Attorney's Office, Boston, MA, for Linda S. McMahon.

*MEMORANDUM AND ORDER ON DEFENDANT–APPELLEE'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER AND PLAINTIFF–APPELLANT'S MOTION TO REMAND*

STEARNS, District Judge.

On January 17, 2003, Maria Teves applied for Social Security Disability Income (SSDI) benefits claiming an inability to work as of June 17, 1985. Teves attributed her disability to spinal problems, stomach disorders (ulcers and acid reflux), and hemorrhoids. Teves claimed that the combination of physical ailments, exacerbated by anxiety and depression, made it difficult for her to sit, stand, or concentrate for any extended period of time. Teves' claim was denied by the Social Security Administration (SSA) on initial review and on reconsideration.

On May 3, 2004, at Teves' request, a hearing was held before Administrative Law Judge (ALJ) James H. Packer. Teves testified at the hearing. On July 24, 2004, the ALJ, in a written decision, found that Teves' eligibility period for SSDI benefits expired on June 30, 1991.[2] The ALJ further held that Teves had failed to demonstrate that she suffered from a severe impairment prior to the expiration date of her insurance. On February 9, 2005, the Appeals Council denied Teves' request for further review, affirming the ALJ's opinion as the final decision of the Commissioner.

On April 6, 2005, Teves brought this action in the district court pursuant to 42 U.S.C. § 405(g). Teves argues that the ALJ erred in terminating her claim at Step 2 of the required sequential step analysis. On May 2, 2006, the Commissioner filed a cross-motion seeking an affirmance of the ALJ's decision. The court heard oral argument on January 26, 2007.

### BACKGROUND

In his decision, the ALJ found that Teves was

a 54–year–old individual with a fourth grade education in the Azores. Her past work experience includes employment as a clothing factory worker.[3] She alleges that she became disabled on June 17, 1985 due to depression, anxiety, hypertension, low back pain and gastroesophageal reflux disease. The claimant meets the nondisability requirements set forth in Section 216(i) of the Social Security Act and is insured for disability benefits through June 30, 1991. Therefore, the claimant must establish disability *on or prior to* this date. (Emphasis in original).

. . .

The record demonstrates that Ms. Teves had complaints of abdominal pain and a nerve attack that was characterized by a loss of consciousness. Medical notes from the Brigham and Women's Hospital from that 1985 incident could not determine [an] etiology for either issue. There is additional evidence of low back pain that began in 1984, but with no additional treatment until 1985.

A psychological examination completed on February 13, 2004 by Charles Howland, Ph.D. found that Ms. Teves had mild mental retardation, there is no other evidence in [the] file that would support that decision raising questions as to its validity. While Dr. Howland, himself, felt the test results were valid, he further notes that the earliest date this condition existed was 1996, well after the claimant's insured status expired. (Exhibit references omitted).

At the hearing before the ALJ, Teves testified that she left her job in 1986 because of hemorrhoidal pain and "terrible" nerves, the combination of which made it difficult for her to concentrate and keep pace with her work. She also testified that her social contacts were limited to her family and that she rarely left her house. The ALJ, while not discounting Teves' testimony, found that the medical records did not support her claim of a severe impairment.

[A]t the time the claimant's insured status expired, the undersigned finds that Ms. Teves had a history of probable anxiety, a history of hemorrhoid surgery, a history of abdominal pain and a history of an upper respiratory infection. However, none of these conditions is found to have had an impact on Ms.

---

**2.** Teves does not dispute the ALJ's finding in this regard.

**3.** Teves worked as a thread trimmer and as a steam press operator. 2

Teves['] ability to work *at the time of her date last insured.* She was not in active treatment for any of these conditions, overall medical treatment was minimal and there is no evidence of limitation or restriction. Potentially significant was the 2004 diagnosis of mild mental retardation, which may limit her to unskilled work. However, there is no history of mental retardation except for this one examination; she worked from 1979 through 1986; she attended four years of school in the Azores; she learned to read and write; and nothing else in the treatment records indicate cognitive difficulties. The radiating back pain complained of in 1997 apparently stems from a May, 1996 motor vehicle accident. Therefore, Ms. Teves does not have a severe impairment at the time her insured status expired. (Exhibit references omitted).

Teves' pertinent medical records are as follows.[4] On January 17, 1984, Teves presented to her personal physician, Dr. De Sa Pereira, complaining of "stomach ulcer" pain, "passing out," back pain, nervousness, and constipation. Dr. De Sa Pereira noted tenderness in Teves' back at L5–S1. His follow-on notes through June 4, 1984, indicate that Teves continued to suffer back pain, epigastric pain, and constipation, as well as a worsening hemorrhoid condition. In June and July of 1985, Teves reported to Dr. De Sa Pereira that she was experiencing "attacks" resulting in headache, dizziness, and rigidity. Dr. De Sa Pereira prescribed anti-anxiety and anti-depressant medications.

On July 26, 1985, a radiology report indicated that Teves suffered from a duodenal ulcer. On August 20, 1985, Teves was seen at the Brigham and Women's Gastrointestinal Clinic for stomach pain. Teves returned to Brigham and Women's on October 1 and 4, 1985, and on November 14, 21, and 30, 1985, complaining of hemorrhoidal pain and blood in her stools. On December 17, 1985, Teves underwent a "banding" procedure for her hemorrhoids without any resolution of her symptoms.

Previously, on September 6, 1985, Teves had been referred to the Brigham and Women's Neurology Clinic after complaining of severe headaches which she attributed to increased stress at work.[5] The Neurology Clinic noted that Teves suffered from frequent panic attacks, accentuated by severe anxiety, dizziness, and sporadic blackouts. A Neurology Clinic doctor increased Teves' dosage of Elavil (a prescription headache drug). When Teves returned to the Clinic on September 21, 1985, she had quit working because of abdominal pain, fainting spells, and " 'severe attacks' characterized by loss of consciousness, rigidity of arms and legs with incontinence, eyes cloud, lasting for unknown time...." Teves stated that the severity of the attacks lessened when she took her anti-depressant medication, but that she was experiencing increased pain in her right upper back. The treating physician at Brigham and Women's observed that the attacks resembled seizures, and questioned whether Teves might be suffering from migraine headaches.

On February 11, 2003, and April 7, 2003, the Disability Determination Services reviewed Teves' medical record on behalf of

**4.** The ALJ, with one appropriate exception, limited his consideration of Teves medical history to the insured period, 1985 to 1991. While the history is well-documented for the period 1984–1986, it ceases at the end of 1986 and does not resume until 1995.

**5.** On October 7, 1985, Teves underwent an electroencephalogram with normal results.

the SSA. The examiners reported that the medical evidence was insufficient to permit a definitive functional assessment of Teves' condition as of June 30, 1991 (the date on which her insurance expired).

On February 13, 2004, Dr. Charles Howland, a psychologist, conducted an evaluation of Teves at her attorney's request. Dr. Howland diagnosed Teves as having dysthymic disorder, panic disorder with agoraphobia, mild mental retardation, and dependent personality disorder.[6] He based his diagnosis of mild mental retardation on the results of a Wechsler Adult Intelligence Scale test. These indicated that Teves had a full scale IQ of 58, a verbal IQ of 62, and a performance IQ of 59. Dr. Howland also completed an SSA Residual Functional Capacity Questionnaire (RFCQ). Dr. Howland stated that Teves was severely impaired in her ability: (1) to understand, carry out, and remember instructions; (2) to respond appropriately to supervision; (3) to respond to customary work pressures; and (4) to perform complex, repetitive, and varied tasks.

## DISCUSSION

In evaluating a disability claim, the ALJ is required to follow the "sequential step analysis" set out in 20 C.F.R. § 404.1520. The ALJ must first determine whether a claimant was gainfully employed prior to the onset of the disabling condition. The ALJ must then determine whether the claimant suffers from a severe impairment limiting her ability to work. If the impairment is the same as, or equal in its effect to, an impairment (or combination of impairments) listed in Appendix 1 of Subpart P of the regulations, the claimant is presumptively deemed disabled. If the impairment is not covered by Appendix 1, the fourth step of the analysis requires that the claimant prove that her disability is sufficiently serious to preclude a return to her former occupation. *Goodermote v. Sec'y of Health and Human Serv.*, 690 F.2d 5, 6–7 (1st Cir.1982). Only if she meets that burden is the Commissioner at the fifth step obligated to prove that there are other jobs in the national economy that she could nonetheless perform. *Gonzalez Perez v. Sec'y of Health, Education and Welfare*, 572 F.2d 886, 888 (1st Cir.1978). The findings of the Commissioner are conclusive so long as they are supported by substantial evidence and so long as the Commissioner has applied the correct legal standard. 42 U.S.C. § 405(g); *Manso–Pizarro v. Sec'y of Health and Human Serv.*, 76 F.3d 15, 16 (1st Cir.1996).

At Step 2, the claimant has the burden of proving, through objective medical evidence, that her impairments are severe. *See* 20 C.F.R. § 404.1508; § 404.1512. According to the SSA regulation explicating what is meant by an impairment that fails to meet this requirement:

(a) ... An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) ... When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

6. Dr. Howland also noted a history of hypertension and lower back pain.

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521.

■ The regulations permit the termination of a claim at Step 2 when the applicant fails to make a colorable showing of a severe impairment. *See* 20 C.F.R. §§ 404.1520(c). The burden on the claimant at Step 2, however, is not onerous. As Social Security Ruling (SSR) 85–28 explains: "[a] claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities. If such a finding is not clearly established by medical evidence ... *adjudication must continue through the sequential evaluation process*." (Emphasis added).[7]

■ In denying Teves' application for benefits at Step 2, the ALJ did not credit Dr. Howland's diagnosis that Teves suffered from mild mental retardation: (1) because "there [wa]s no other evidence in [the] file that would support that decision raising questions as to its validity;" and (2) because in answering the question posed

by the RFCQ: "What is your opinion as to the earliest date the *same level of severity* existed?," Dr. Howland wrote the year "1996." (Emphasis added).

In this latter regard, it is evident that the ALJ took Dr. Howland's answer to mean that the onset date of Teves' mental retardation occurred in 1996. In commenting on the answer, the ALJ wrote: "While Dr. Howland ... felt that the [mental impairment] test results were valid, he further notes that the earliest date this condition existed was 1996 ..., well after the claimant's insured status expired." It is possible that this is what Dr. Howland meant. But, it seems equally (if not more) plausible that Dr. Howland was opining as to when Teves' various medical conditions in combination with her mental retardation reached the severity level that he observed in his 2004 examination. Mental retardation is, absent major trauma to the head (of which there is no evidence in the record), a congenital condition that has no "onset" date.[8]

■ The further admonition of SSR 85–28, that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the non-severe evaluation [at Step 2]," has special force in cases

---

7. Prior to the promulgation of SSR 85–28, the Step 2 termination power was very controversial. "Critics contend that the application of this regulation [20 C.F.R. § 404.1521] has improperly and unfairly increased the number of claimants who are denied benefits based entirely on the purported medical non-severity of their impairment, without any consideration of the effect of the impairment on their ability to perform gainful activity." *McDonald v. Sec'y of Health and Human Serv.*, 795 F.2d 1118, 1121 (1 st Cir.1986). The *McDonald* court, however, found that the criticism had been adequately addressed by SSR 85–28 and the Secretary's interpretation of the Step 2 regulation as "no more than ... a

*de minimis* screening policy," intended to weed out applicants "whose impairments are so minimal that, as a matter of common sense, they are clearly not disabled from gainful employment." Id. at 1122.

8. While the government at oral argument conceded the intuitive correctness of this statement, it objected to the court taking judicial notice of a medical fact of which there is no evidence in the record. Given that the ALJ's error in terminating the analysis at Step 2 was legal and not factual, the objection has no bearing on the court's ultimate ruling.

involving mental impairments that can be objectively measured by IQ testing. Under Listing 12.05(C) of Appendix I to Subpart P, the required level of severity for mental retardation is met when a claimant has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." Putting aside the issue of mental retardation, the ALJ found that the .medical evidence was sufficient to show that Teves, at the time her insured status expired, had "a history of probable anxiety, a history of hemorrhoid surgery, a history of abdominal pain and a history of an upper respiratory infection." In *Nieves v. Sec'y of Health and Human Serv.,* 775 F.2d 12, 13 (1st Cir.1985), the claimant was found to have a full scale IQ of 63. Nieves was also afflicted by severe chronic cervico-dorsal myositis and depressive neurosis. Nonetheless, she was found by the Appeals Council not to suffer a severe impairment. The First Circuit summarily reversed.

> In its decision reversing the ALJ's finding of disability, the Appeals Council noted that the I.Q. scores in evidence "if accurate, would be so limiting that the claimant would never have been able to perform her prior work as seamstress." The Council pointed out that the record reflected "fairly regular work activity in the decade preceding the alleged date of disability onset." The discrediting of the I.Q. scores was improper for several reasons. First, the Secretary is simply not at liberty to substitute her own opinions of an individual's health for uncontroverted medical evidence. This evidence was the *only* medical evidence before the ALJ on this point. Second, courts do not engage in further inquiry as to the first (I.Q.) requirement of Listing 12.05(C) once they find that the claimant's I.Q. was below 70. Third, the Secretary is incorrect in reasoning that the I.Q. score, if accurate, would have prohibited the claimant from ever working. That an I.Q. of 63 is only a mild form of retardation follows from the regulations. Before requiring a finding of disability for a person with an I.Q. between 60 and 69, the Listings require evidence of another impairment.... [Claimant Nieves] became unable to continue working only after she developed severe chronic myositis; the combination of the physical and mental impairments significantly limited her work-related functions.

*Id.* at 14 (footnote omitted). *Cf. Bowen v. Yuckert,* 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

It may well be on remand that the ALJ will conclude that Teves is not entitled to benefits. He might decide that the physical impairments that existed at the expiration of the insured period, even when considered with Teves' mental retardation, did not amount to a significant limitation on Teves' ability to perform at least some jobs in the national economy. Then again, he might not.[9] Or, on further inquiry or supplementation of Dr. Howland's report, it may prove that Dr. Howland meant what he said when he inserted the date "1996." (There is evidence in the medical history suggesting that Teves' condition took a

---

9. In rejecting Dr. Howland's report, the ALJ remarked that

> [p]otentially significant was the 2004 diagnosis of mild mental retardation (Exhibit 12F), which may limit [Teves] to unskilled work. However, there is no history of mental retardation except for this one examination; she worked from 1979 through 1986;

> she attended four years of school in the Azores; she learned to read and write; and nothing else in the treatment records indicate cognitive difficulties.

The assessment of Teves' ability to perform unskilled work should have been performed at Step 4 of the analysis and not at Step 2.

turn for the worse after an automobile accident in 1996). It might also be that "1996" is simply a scrivener's error and that Dr. Howland meant to write "1986" instead. In other words, it is open to the ALJ on remand to find that Teves' impairments were not sufficiently severe in 1991 so as to amount to a total disability within the meaning of SSA regulations. However, given the uncertainty of the medical evidence regarding the effects of Teves' mental retardation, when considered in combination with the physical ailments the ALJ found credibly supported by the record, it was error to make that finding at Step 2 of the sequential step analysis.

### ORDER

For the foregoing reasons, Teves' motion to remand the case for further proceedings is *ALLOWED.* Defendant's motion for an order affirming the Commissioner is *DENIED.*[10]

SO ORDERED.

**10.** In light of the decision to remand Teves' case for a reevaluation of the decision to terminate her application at Step 2, the court need not address Teves' second ground of appeal that the ALJ failed to assess her subjective complaints of pain under the so-called *Avery* factors. *See Avery v. Sec'y of Health and Human Serv.,* 797 F.2d 19, 23 (1st Cir.1986).